UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CADDO SYSTEMS, INC. and 511 TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SIEMENS AKTIENGESELLSCHAFT (AG) and SIEMENS INDUSTRY, INC., <br><br> Defendants. | No. 20 C 05927 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Caddo Systems, Inc. and 511 Technologies, Inc. filed patent infringement claims against Siemens Aktiengesellschaft (AG) and Siemens Industry, Inc. ("SII"). After SII identified a potential licensing defense related to a settlement agreement from earlier litigation involving Plaintiffs, the court ordered limited discovery as to that issue. This limited discovery has now concluded and before the Court is SII's motion for summary judgment as to its licensing defense.[1] For the reasons set forth below, SII's motion is granted.

**Background**

I. <u>Asserted Patents</u>

The following facts are undisputed except as otherwise indicated. Plaintiffs' complaint asserts six patents: U.S. Patent Numbers 7,191,411 (the "'411 patent"),

---

[1] Siemens AG has separately moved to dismiss for lack of personal jurisdiction and has not joined SII's motion for summary judgment.

1

7,216,301 (the "'301 patent"), 7,640,517 (the "'517 patent"), 7,725,836 (the "'836 patent"), 8,352,880 (the "'880 patent"), and 10,037,127 (the "'127 patent") (collectively, the "Asserted Patents"). Plaintiffs' L.R. 56.1(B)(2) Response ("PR") ¶ 5. The Asserted Patents are alternatively titled "Active Path Menu Navigations System" or "Active Path Navigation System," and generally claim methods for displaying graphical user menus, displaying items in a given menu level, and enabling selection thereof via an invention Plaintiffs refer to as an "active path." PR ¶ 6, 27.

II.  Prior Litigation & License Agreement

Plaintiffs previously filed an infringement suit against Microsoft Corporation, in which they asserted four of the patents at issue in this case. PR ¶¶ 14, 15; *see 511 Techs., Inc. v. Microsoft Corp.*, No. 2-17-cv-00178 (E.D. Tex.). The remaining two Asserted Patents in the instant litigation are continuations of patents that were asserted in the previous litigation in Texas. PR ¶ 7.

The Texas litigation ultimately resolved via a Settlement and License Agreement (the "License Agreement"). PR ¶ 14. The License Agreement includes several relevant definitions:

> **1.3** **"Entity"** includes an individual as well as any organization or organizational unit (including, for example, a corporation . . .).
>
> **1.4** **"Licensed IP"** means the Patents in Suit and all patent and applications that are continuations, divisionals, continuations-in-part, reissues, reexaminations, post-grant amendments, U.S. or foreign counterparts, or parents or ancestors of any patents or applications described in this Section 1.4 . . . .
>
> **1.5** **"Microsoft Technology, Products and Services"** means (a) any past, present, or future MS Group's technology, products and services including any past, present, or future technology, products, and services designed, branded, made, sold (or leased), offered for sale (or

2

offered for lease), purchased, obtained, made available, exported, imported, supplied, licensed, distributed, hosted, used, streamed, exploited, encoded, decoded, or otherwise provided to, by or for MS Group or (b) any past, present, or future technology, products and services to the extent that they are combined with, used with or aggregated with any past, present, or future technology, products and services included in Section 1.5(a) above, but only the portion of such combination, usage or aggregation that consists of or uses the Microsoft Technology, Products and Services included in Section 1.5(a) above.

PR ¶ 16.

The License Agreement includes one relevant release:

**2.2    Release for use of Microsoft Technology, Products and Services.** The 511/Caddo Releasing Entities hereby voluntarily and irrevocably release any and all Entities of and from any and all actions, causes of action, claims or demands, liabilities, losses, damages, attorney fees, court costs, or any other form of claim or compensation, whether known or unknown arising out of infringement or alleged infringement of the Licensed IP to the extent that such infringement is, was or will be based on any Microsoft Technology, Products and Services (or the use thereof), in whole or in part.

PR ¶ 19. The License Agreement also grants the following license:

**3.2    License for Microsoft Technology, Products or Services.** 511/Caddo hereby grant to any and all Entities a worldwide, irrevocable, perpetual, nonexclusive, fully paid-up license under the Licensed IP to (a) design, have designed, brand, make, have made, sell (or lease), offer for sale (or offer for lease), purchase, obtain, make available, export, import, supply, license, have licensed, distribute, have distributed, host, use, stream, exploit, encode, decode or otherwise provide Microsoft Technology, Products and Services; (b) practice or have practiced any method or steps claimed in whole or in part in or by the Licensed IP with Microsoft Technology, Products and Services; and (c) engage in any act as to the Microsoft Technology, Products and Services that might otherwise be prohibited but for having a license to the Licensed IP.

PR ¶ 20. Finally, the License Agreement contains two relevant covenants not to sue:

**4.2    Covenant as to Microsoft Technology, Products and Services.** The 511/Caddo Releasing Entities hereby covenant not to sue (or otherwise act in any way to seek to enforce or assist or encourage anyone else to enforce any rights against) any and all Entities for

3

infringement or alleged infringement of the Licensed IP to the extent that such infringement or alleged infringement is, was or will be based on any Microsoft Technology, Products and Services (or the use thereof), in whole or in part.

**4.3 Covenant Regarding Not Using or Relying on Microsoft Technology, Products and Services to Satisfy Claim Element.** The 511/Caddo Releasing Entities hereby covenant and agree that no Microsoft Technology, Products and Services, or the use thereof, shall be used or relief on (in whole or in part, and whether in litigation, mediation, arbitration, demand, cease and desist communication, licensing negotiation, or otherwise) by any 511/Caddo Releasing Entity to satisfy (in whole or in part) any claim or any element, step, means, or limitation of any claim (including any in the preamble) or any Licensed IP with respect to any Entity, and no evidence of any Microsoft Technology, Products and Services, or the use thereof, shall be used (in whole or in part, and whether in litigation, mediation, arbitration, demand, cease and desist communication, licensing negotiation, or otherwise) by any 511/Caddo Releasing Entity against any Entity in any claim chart, motion, hearing, or trial with respect to any Licensed IP.

PR ¶ 21. The license and covenant not to sue are limited by an additional paragraph:

**4.4** However, the License in Section 3.2 and the covenant in Section 4.3 do not preclude enforcing the Licensed IP against third parties based on third party products (i.e., products that are not Microsoft Technology, Products and Services), solely because such third party is using Microsoft Technology, Products and Services, provided that (1) such Microsoft Technology, Products and Services are a staple article or commodity of commerce suitable for substantial non-infringing use, (2) such Microsoft Technology, Products and Services do not provide an essential or inventive aspect of any claim of the Licensed IP and (3) such enforcement would not give rise to any obligation by the Microsoft Released Entities to provide a defense or indemnity related to such enforcement.

PR ¶ 21.

III. <u>Accused Instrumentalities</u>

The Accused Instrumentalities identified by Plaintiffs include SII's "Desigo CC" software. PR ¶ 24. That software includes functionality whereby the user interface displays hierarchical data and allows a user to view, select, and navigate to

4

a plurality of items in a multi-level collapsing menu structure. *E.g.*, PR ¶¶ 25, 28. The parties dispute exactly what this function is called. Defendants refer to it as "breadcrumb" functionality. PR ¶¶ 27, 30. Plaintiffs refer to it as the "active path," and claim that "breadcrumb" functionality alone lacks the capability of "generating or displaying sibling items, subordinate items, or drop-downs containing these items." PR ¶¶ 27, 30. Regardless of the terminology, there is no dispute that this hierarchical menu navigation function is the relevant portion of the accused Desigo CC software. The Court will refer to it as "breadcrumb" functionality for ease of reference.

The breadcrumb functionality in Desigo CC is provided by "RadBreadcrumb" software, supplied by third-party software provider Telerik. PR ¶¶ 35, 70, 71. RadBreadcrumb is "built on top of" the Microsoft .NET Framework and Windows Presentation Foundation ("WPF"). PR ¶ 78. WPF is a subsystem of .NET and is a "collection of libraries that contribute to creating user interface applications in a particular environment, in the Microsoft environment." PR ¶ 42. Microsoft .NET and WPF alone do not provide breadcrumb functionality. PR ¶ 52. Rather, within its source code, RadBreadcrumb references different pieces of .NET, identified by various "namespaces" that include Microsoft-developed code. PR ¶ 76. A namespace is used to "uniquely identify object classes within software libraries that provide a particular functionality." PR ¶ 59. The Microsoft .NET namespaces identified in RadBreadcrumb's source code are "needed for RadBreadcrumb to function." PR ¶ 75.

As explained by SII's corporate deponent Neil Rhodes, Microsoft .NET and WPF provide two functions relevant to the breadcrumb functionality at issue. First,

5

they provide the ability to render the display itself—*i.e.*, the image on the computer screen that a user sees and interacts with. Second, they detect all user interaction with the display, such as keyboard presses, mouse movements, and mouse clicks. These interactions are then communicated to the breadcrumb control (RadBreadcrumb) which contains code governing how the system will react. Rhodes testified that without the Microsoft subsystems communicating this information, Desigo CC would not know how the user was interacting with the display. PR ¶ 45.

While .NET provides user interface and interaction functions, Telerik's corporate deponent Stefan Stefanov testified that RadBreadcrumb "displays the [breadcrumb] and the different branches of the [breadcrumb]." Because .NET does not provide breadcrumb functionality by itself, RadBreadcrumb performs such additional functions as "display[ing] paths or links," "triggering the display of menu items," and "collapsing the menu structure after an item on the active path is selected." PR ¶ 45. In this way, RadBreadcrumb "will change what is displaying based on what the user selected." R. 154, at 9. However, Stefanov also testified that RadBreadcrumb's source code will not work without Microsoft technology. PR ¶ 83. He explained that Telerik's code "tell[s] Microsoft .NET Framework that we need to use this piece of it or that piece of it. So every line is a separate piece that we need to utilize from the .NET Framework." PR ¶ 76. In response to questioning by Plaintiffs' counsel as to whether the entire system could be analogized to a car, Stefanov testified, "If I have to use that analogy, I would say that the .NET Framework is all

6

of the pieces of the car and Telerik is taking them and putting them together to build the car and the car is the Breadcrumb control." R. 158 at 10 n.15.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

The License Agreement dictates that it is to be construed under Texas law. PR ¶ 22. Under Texas law, the Court's "primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). "Objective manifestations of intent control." *Id*. Unless

7

a contract specifies otherwise, contract terms are interpreted according to their "plain, ordinary, and generally accepted meaning." *Id.* at 764 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). The interpretation of unambiguous contract terms is a question of law. *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003).

I.  <u>SII qualifies as an "Entity" under the License Agreement.</u>

Section 1.3 of the License Agreement defines "Entity" to include "any organization or organizational unit (including, for example, a corporation . . .)." Plaintiffs seem to suggest that only entities that are part of Microsoft are entitled to any benefits under the contract. *See* R. 154, at 19. This argument improperly draws in elements of the "Microsoft Technology, Products and Services" definition discussed below. It also ignores that the License Agreement releases, licenses, and covenants not to sue a separately defined group of "Microsoft Released Entities" via provisions comparable to sections 2.2, 3.2, and 4.2. For example, section 2.1 states, "The 511/Caddo Releasing Entities hereby voluntarily and irrevocably release each of the Microsoft Released Entities of and from any and all actions . . ." PR ¶ 19. Section 2.2, however, grants the release described therein to "any and all Entities." The latter phrasing is broader and limited only by the definition of "Entities" in section 1.3. SII clearly falls within that definition and qualifies as an "Entity" as that term is used in the relevant rights-granting provisions.

8

II. <u>The License Agreement's definition of "Microsoft Technology, Products and Services" encompasses the RadBreadcrumb component of Desigo CC.</u>

The License Agreement's definition of "Microsoft Technology, Products and Services" has two components. The first, set out in clause (a) of section 1.5, encompasses any past, present, or future technology, product, or service offered to, by, or for Microsoft or its affiliates. While this clause encompasses .NET and its WPF subsystem, SII does not (and could not) suggest that the RadBreadcrumb component of Desigo CC falls within this portion of the definition, because neither are Microsoft products.

The second component, clause (b), encompasses a separate category of "past present, or future technology, products and services to the extent that they are combined with, used with or aggregated with" any technology included in section 1.5(a), "but only the portion of such combination, usage or aggregation that consists of or uses the" Microsoft technology. SII's central argument is that RadBreadcrumb is "combined with, used with or aggregated with" Microsoft technology. SII claims RadBreadcrumb is therefore captured by the definition in section 1.5(b) and covered by the corresponding release, license, and covenant in the License Agreement.

Plaintiffs dispute that either RadBreadcrumb or Desigo CC as a whole come within section 1.5. However, Plaintiffs' reading of section 1.5 does not square with the contract language. According to Plaintiffs, "for Section 1.5(b) to apply to SII, the accused Desigo CC product must fall within the scope of "Microsoft Technology, Products and Services" as defined under Section 1.5(a)." This argument overlooks the disjunctive "or" separating 1.5(a) from 1.5(b) and renders the latter clause completely

9

redundant. Section 1.5(b) expressly contemplates technology that is "combined with, used with, or aggregated with" a product covered by 1.5(a)—it makes no sense that this *additional* technology would have to be covered by 1.5(a) as well. True, 1.5(b) contains a condition that non-Microsoft technology is included only to the extent it "consists of or uses" Microsoft technology encompassed in Section 1.5(a). But the logical function of this condition is to clarify that a non-Microsoft product that "uses" Microsoft technology in some limited capacity does not automatically qualify *in its entirety* as "Microsoft Technology, Products and Services" under section 1.5.[2] Here, the accused breadcrumb functionality in Desigo CC is provided by the RadBreadcrumb software component, so the question is whether RadBreadcrumb is "combined with, used with, or aggregated with" Microsoft technology.

Reviewing the uncontroverted evidence and drawing reasonable inferences in Plaintiffs' favor wherever possible, the Court concludes that RadBreadcrumb is "combined with, used with, or aggregated with" Microsoft technology (specifically, Microsoft .NET) and is therefore encompassed by the definition of "Microsoft Technology, Products and Services" in section 1.5. Plaintiffs argue at length that Microsoft .NET and WPF alone are incapable of providing the accused breadcrumb functionality within Desigo CC, and that the claimed methods are in fact practiced by RadBreadcrumb. There does appear to be support for this contention in the record.

---

[2] For example, if a product that infringed on Plaintiffs' breadcrumb patents used Microsoft technology to provide internet connectivity functionality, it would not necessarily be encompassed by the License Agreement if the specific infringing component did not use Microsoft technology.

*See, e.g.*, PR ¶¶ 33, 36, 38. But even accepting that the RadBreadcrumb software is the Desigo CC component that provides this functionality, the evidence demonstrates that it does so by using Microsoft .NET—that is, *Microsoft technology*. RadBreadcrumb's source code includes Microsoft namespaces that are essential for it to function. For example, Microsoft .NET provides user interface functionality by telling RadBreadcrumb how a user is interacting with the software, so that RadBreadcrumb can create a corresponding active path. While Plaintiffs want to focus on that action—"creating an active path"—alone, they cannot avoid the fact that RadBreadcrumb's source code accomplishes this feat by using various pieces of .NET. To borrow the analogy used by Telerik's 30(b)(6) deponent, RadBreadcrumb is building a car (the software instructions that carry out the claimed method) out of Microsoft-provided parts (Microsoft .NET). Indeed, both SII and Telerik's corporate representatives testified that RadBreadcrumb will not work without Microsoft technology. Plaintiffs have cited to no evidence contradicting these facts. The unavoidable conclusion is that RadBreadcrumb is "combined with" or "used with" Microsoft technology, if not both.

The Southern District of New York reached a similar conclusion in a case that closely resembles this one. In *Princeton Digital Image Corp. v. Hewlett-Packard Co.*, 2015 WL 1408754 (S.D.N.Y. Mar. 26, 2015), the defendants claimed that a settlement agreement from prior litigation between PDIC and Microsoft entitled them to summary judgment on PDIC's patent claims. The settlement agreement granted a series of licenses, releases, and covenants not to sue that applied to "Microsoft

11

Products." *Id.* at *2. The settlement agreement defined "Microsoft Products" to include (1) products offered by Microsoft itself, and (2) "any past, present or future combination, hybrid or aggregation that incorporates or uses any Offering described in 1.8(1) above, including without limitation any use with or combination, hybrid or aggregation with any past, present or future third-party Offering." *Id.*

The court held that the defendants' products fell under the definition of Microsoft Products because they were combined with and used various Microsoft software. For example, the accused camera, scanners, and printers used Microsoft .cat files to "seamlessly operate with a Microsoft operating system." *Id.* at *8. They also incorporated Microsoft's FAT32 File System as part of their firmware to facilitate data exchange between the products and Microsoft's operation system. *Id.* Applying the ordinary meaning of the terms in the settlement agreement, the court concluded that the accused products therefore constituted "Microsoft Products." *Id.*

The *Princeton Digital* settlement agreement is not identical to the License Agreement at issue here, but it illustrates how the "Microsoft Technology, Products and Services" definition is meant to operate—to broadly protect products that "use" Microsoft technology as part of their functioning. While the partial limitation in section 1.5(b) is absent from the corresponding definition in *Princeton Digital*, it is undisputed that RadBreadcrumb requires Microsoft .NET software libraries to function, so this difference is irrelevant. The RadBreadcrumb component of Desigo CC uses Microsoft .NET as part of its functionality and is therefore included in the defined category of "Microsoft Technology, Products and Services."

12

III. <u>The rights granted in the License Agreement entitle SII to summary judgment.</u>

Because the Court finds that the RadBreadcrumb component of Desigo CC is covered by the License Agreement's definition of "Microsoft Technology, Products and Services," the Court also finds that third-party release, license, and covenant not to sue extend to SII in this litigation. Section 2.2 releases "any and all Entities" from any infringement action that "is, was or will be based on any Microsoft Technology, Products and Services (or the use thereof), in whole or in part." This language encompasses Plaintiffs' claims here, which are plainly "based on" RadBreadcrumb. Section 3.2 grants "any and all Entities" a license to, among other thing, "practice or have practiced any method or steps claimed in whole or in part in or by the Licensed IP with Microsoft Technology, Products and Services." Again, Plaintiffs' claimed methods here are being practiced by RadBreadcrumb, which is "Microsoft Technology" under section 1.5. Finally, sections 4.2 and 4.3 grant a covenant not to sue "any and all Entities" for infringement that is based on "Microsoft Technology, Products and Services (or the use thereof), in whole or in part," and a covenant not to use "Microsoft Technology, Products and Services" to satisfy any element in a claim. These covenants extend to Plaintiffs' claims against SII in this case for the same reasons.[3]

---

[3] The clawback in section 4.4 of the License Agreement, which by its own terms applies only to the license in section 3.2 and the covenant in section 4.3, does not save any of Plaintiffs' claims. That section applies only to products that are "not Microsoft Technology, Products and Services."

## Conclusion

For the foregoing reasons, SII's motion for summary judgment [R. 145] is granted. Judgment on Plaintiffs' claims against SII is entered in favor of SII. Within 14 days from the entry of this order, the parties shall file a joint status report as to whether they intend to resolve any remaining claims without Court intervention, or if the Court should rule on Siemens AG's motion to dismiss for lack of personal jurisdiction.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: February 11, 2022